**UNITED STATES**

v.

**CITY OF COLUMBUS, OHIO, et al.**

**No. 11720.**

United States Court of Appeals,
Sixth Circuit.

Jan. 22, 1954.

858

Walter J. Welter, Chicago, Ill., and Ray J. O'Donnell and Loren G. Windom, Columbus, Ohio, and Frank A. Gallagher and Walter J. Welter, Chicago, Ill., on the brief, for appellant.

Robert C. Tyler, Columbus, Ohio, for appellees. Richard W. Gordon, City Atty., Hugh K. Martin, Chief Counsel, Edward J. Cox, Sr. Asst. Atty., Columbus, Ohio, on the brief for City of Columbus. Adams, Tyler & McCann and Robert C. Tyler, Columbus, Ohio, on the brief for Rae Columbus, Inc.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The government brought suit for damages to hemp owned by the Commodity Credit Corporation, a wholly owned corporate agency of the United States, resulting from claimed negligence on the part of appellee, City of Columbus, in permitting sewer water to back up into the basement of Rae Columbus, Inc., where the hemp was stored, and for negligence on the part of the storage company in permitting the damage to occur. On a trial before a jury, the district court, at the conclusion of the proofs, directed a verdict of no cause of action in favor of both defendants. The government appeals, claiming that the trial court erred in refusing to permit the introduction in evidence of certain government exhibits, and in directing the verdict of no cause of action.

The determination of this case depends upon the facts, and the facts are as follows: On August 22, 1944, the government, acting through the Commodity Credit Corporation, entered into a contract with Rae Columbus, Inc., a storage company, in which the company agreed to store government-owned hemp in its warehouse at Columbus; and, thereafter, the government delivered 2,859 bales of hemp to the company, of which 969 bales were stored in the basement of the warehouse.

Two years later, on the night of June 18, 1946, there occurred what was variously described by government witnesses as a settling or cave-in of the street and curbing on Vine Street approximately 300 feet from the warehouse of the storage company. This settling of the street of six or eight inches in depth, six feet in length, and two feet in width, was readily apparent, and was reported to the city authorities on the morning of June 19, 1946, by certain adjacent property owners. Mr. Kirk, who operates the Kirk Grocery Company, also notified someone at the city sewer department by telephone, on the same day, of the presence of water in his basement. The Kirk Grocery Company is located immediately west of the warehouse of the storage company, with a single wall approximately two feet thick between the basement of the storage company warehouse and the basement of the grocery company. The floors of the basements were on the same level. There is a doorway with a close-fitting, heavy steel door between the two basements. On the morning of June 19, the evidence shows that there was water four inches in depth in the basement of the grocery company. Mr. Kirk testified that he did not know who the person was with whom he spoke when he called the city sewer department about the flooding of the grocery company basement; and Roy Fenner, general foreman of the department, stated that he did not have any information on the matter until nearly two days later, on June 21, when the police department filed a complaint with the complaint division of the sewer department with respect to the settling of the street. On that day, Mr. Fenner immediately went to make an inspection and sent a crew to place barricades and red lights around the cave-in. He then, with chalk, marked out a place for excavation on the surface of the street, and dispatched a crew with an air compressor and other equipment to excavate the next morning. At that time, Mr. Fenner testified that he did not know that the flooding in the basement of the Kirk Grocery Company was caused by a cave-in of the main sewer. At first, he thought that the back-up of water in the grocery company basement resulted from the clogging of the sewer connection from the adjacent J. I. Case Company building; and with this in mind, he went into the basement of that building, measured where its outlet was, and judged where it went outside, concluding that it was right at the spot where he gave the orders for excavation.

All of the foregoing constitutes the background and much of the important evidence upon which the government relies in its claims of negligence advanced against both the City of Columbus and the storage company, Rae Columbus, Inc.

Although the flooding of the Kirk Grocery Company basement adjoining

the basement of appellee Rae Columbus, Inc., took place on the night of June 18 or the morning of June 19, no damages are claimed for any flooding at that time. It is the present theory of the government that the City of Columbus negligently failed to maintain a system of inspection of the Vine Street sewer so that it might discover defects in the sewer, and remedy them, in order to prevent damage from flooding the basements of adjacent property owners; that it negligently permitted the sewer water to back up into the Rae Columbus Company's basement on June 27 by failing properly to maintain and repair the adjacent city sewer; and that the storage company negligently permitted the government hemp which was stored in its basement to be damaged by failing to remove it from its basement prior to June 27, after it knew, or should have known, of the presence of some water in its basement and of the defective condition of the sewer in question.

We shall first discuss the government's case against Rae Columbus, Inc., the storage company. It is the government's claim that water backed up from the main sewer into the basement of the storage company as the result of a collapse of the sewer and the rainstorm of June 18, 1946; that the storage company knew, or should have known, of the flooded condition of its basement at that time; that it, accordingly, should have removed the government-owned hemp from the basement to one of the upper floors; and that its failure to do so was negligence which resulted in the damage to the hemp for which the government seeks recovery.

Gaylord Stinchcomb, the owner of appellee company, Rae Columbus, Inc., testified that he had no notice or knowledge of any defect in the sewer in question or of any water backing up into his basement until the night of June 27; that the hemp was damaged to a certain extent from the flooding and backwater of the sewer on the latter date; that it was thereafter removed under the direction of agents of the government and stored on an open lot under tarpaulins.

To counter the foregoing, the government introduced evidence to the effect that in the basement adjoining Rae Columbus, Inc., and on the same level, there was water four inches deep on the morning of June 19, and that there was a doorway between the two basements, with the conclusion implicit that the basement of appellee company must have been flooded also. However, as heretofore remarked, a heavy steel, close-fitting fire door and a twenty-four inch wall separated the two basements. The basement floor of appellee Rae Columbus was made of planks nailed on four by four beams that were partly imbedded in the ground which consisted of gravel. There were cracks between the beams and drainage tiles beneath the floors that drained into the elevator pits which were four to seven feet below the level of the storage company's basement. The water in these pits was regularly pumped out inasmuch as the motors of the elevators would not operate if the pits were filled with water. Mr. Stinchcomb testified that unless water came into his basement very fast, it would drain through the gravel beneath the floor to the elevator pits; that there was always some water in these pits from drainage in the area; that the pits were never filled with water until the storm of June 27, at the time when the hemp was damaged; that there was no water on the floor of the basement prior to June 27 as the elevators were running and the employees of the company were continually working in the basement; that the hemp was stored, resting on dunnage, or wooden two by fours, which raised the hemp above the floor and permitted the circulation of air underneath; that when hemp becomes wet, it is very inflammable, and that when it was originally stored in the basement, it was necessary to follow the directions of the city fire inspectors in order to comply with the fire code of the City of Columbus; that when the basement was flooded from the exceptional rains of June 27, it required two days to remove the hemp

because the workmen could not work for any considerable time, since the wet hemp generated a temperature of 130 degrees in the basement, and it was necessary to have the city firemen there with their fire hoses, ready for a fire that was expected to break out at any time. Mr. Stinchcomb further testified that he had not heard of the flooding of any basement prior to June 27 and that, while he had happened to notice some workmen excavating in the street about three hundred feet away from his building, he did not know anything about a sewer break, or what the men were repairing.

The government's chief witness was M. G. Moksnes who for several years had been employed by the War Hemp Industries, the agency in charge of the storage of the hemp which was damaged in this case. In answer to the first question asked him about appellee storage company, Mr. Moksnes testified that he could not recall whether he had visited the storage company warehouse after the water had backed up into the basement or not. He did say that he was there on June 21. This was two days after the water had flooded the Kirk Grocery Company basement and after, as it was subsequently learned, the first cave-in of the sewer had occurred. When he visited the storage company at this time, it was as a result of instructions from his employer to examine nine bales of fiber that had been damaged long before it had been stored with Rae Columbus, Inc. Mr. Moksnes testified that when he went to appellee's basement on that day, he found "a rather humid condition" and a "trace of water" on the floor, and some water in the elevator pit. He further testified that after he had seen the trace of water on the floor, he talked generally about the matter with Mr. Stinchcomb, the owner of the storage company, with respect to the basement's being damp and the "water spots" on the floor and damage to some of the bales, all of which was denied by Mr. Stinchcomb. However, it was brought out on cross-examination that these damaged bales, amounting to nine in number, were

the very ones he had been sent down to examine on instructions given him before the first break in the sewer occurred, and it was admitted that he had been informed by his employer, the War Hemp Industries, that these bales had been damaged long before the time that the first break in the sewer took place. Mr. Moksnes stated that after his visit to the storage company, he made an official report of his inspection to his employer, the War Hemp Industries, and that although he knew that dampness and water were the most dangerous foes that hemp has, he never mentioned either dampness or water in the basement of appellee company in his official report. He did, however, on the same day on which he made the inspection of appellee's premises, afterward make an inspection of the premises of the Fifth Area Warehouse (which had no connection with appellee company), where government fiber was also stored. Here, he did find water in the basement, and in his report covering both appellee company's basement and the Fifth Area Warehouse basement, he reported water in the Fifth Area basement only. As a result of his report, the head of the War Hemp Industries wrote appellee company asking it to secure a large amount of slightly damaged hemp at the Fifth Area Warehouse and store it in the warehouse of appellee. Mr. Moksnes was present at the meeting where it was decided to send this letter to appellee company, and this clearly indicates that there was at that time, subsequent to June 19, no objection mentioned by Mr. Moksnes to storing additional hemp in appellee's warehouse. We assume that Mr. Moksnes was not fabricating evidence, but when he was testifying about a trace of water or water spots on the floor of appellee's basement, he was obviously in error, as he was apparently thinking of the water he found in the basement of the Fifth Area Warehouse which he inspected after he had seen appellee's warehouse. For he testified, when he was contradicted on the facts by the statements in a letter from his employer as to his purpose in

going to Columbus on June 21, that the letter refreshed his recollection and that "After all, the Government had several warehouses, and it is pretty hard to remember as far back as that just what the purpose was in each case."

Appellees, in their briefs, submitted that if the hemp was damaged by any backwater resulting from the break in the sewer of June 18, as the government argued that Mr. Moksnes' testimony tended to establish, the government was guilty of contributory negligence in not causing the hemp to be removed after Moksnes knew of the spots of water and the humid condition as he testified, and after he had reported these facts to his employer. But, caught on this horn of the dilemma, the government, in its reply brief, in order to escape the logical conclusion, threw much of its case to the winds and stated that there was nothing in the record to show that anyone even remotely connected with the government knew or should have known of any sewer back-ups that had occurred, or of the street cave-in, or of any danger to the hemp in the Rae Columbus warehouse; and it further declared: "The dangerous condition calling for prompt action was not the rather humid condition and trace of water on the floor in the Rae Columbus basement, but the defective condition of the Vine Street sewer."

However, after the backing up of water during the excessive rainfall of June 27, the hemp damaged thereby was removed from the warehouse and, under instructions of the government, was stored on an adjacent lot with a kind of roof made over it of two by fours and tarpaulins. The following month, on July 15, Moksnes, who by that time had severed his connections with War Hemp Industries and had become associated with a company of which he was part owner and president, purchased all of this damaged fiber from the government and gave notice of the purchase to appellee company, directing it to be loaded and shipped to his plant at Union Grove, Wisconsin. Moksnes testified that he bought the hemp at a fraction of its orig-

inal value because of its damaged condition, and it was for this damage that the government sought recovery in the instant case. Testifying as a government witness, under cross-examination, Moksnes was asked if the weather had not caused the greatest damage to the hemp when it was stored in the open under the tarpaulins. He replied that damage from the weather would have been impossible and he gave various explanations why. However, he had forgotten the letter which he had written Mr. Stinchcomb on September 12, 1946, and which completely destroyed his testimony and proved that the really substantial damage to the hemp had resulted, not from any flooding in appellee's basement, but while it was stored under government orders in the vacant lot. In the letter, he stated to Mr. Stinchcomb: "Truthfully speaking, Pete, I wish I had never fooled with it. The fiber did not look beyond possibilities when I last saw it down there, but the several soakings it got from rains after the canvas covering was blown off here and there and the heating which took place, depreciated the fiber to the point where towards the last we simply reloaded the bales here and hauled them to the dump."

The government claims that appellee storage company, while not liable for any damage resulting from the sewer break of June 18, was liable for the damage resulting from the flooding of its basement on June 27. The issue, therefore, is whether there was evidence to submit to the jury that appellee Rae Columbus, Inc., the storage company, knew or should have known of the flooded condition of its basement and the damage to the hemp as a result of the collapse of the sewer on June 18, and was, therefore, guilty of negligence in not removing the hemp stored in its basement to an upper floor, before the flooding of June 27.

It clearly appears from the testimony of the government's chief witness, Moksnes, that subsequent to June 18 and prior to June 27, there was no damage whatever to any of the bales of hemp stored in appellee's basement as a result of

backed-up sewer water. The only damaged hemp that Moksnes saw at any time during this period was hemp which had been slightly damaged before it had even been stored in appellee's basement. It was the theory of the government that such hemp had been damaged while in appellee's basement by sewer water prior to June 27, but the evidence on the trial destroyed this theory. The foregoing would seem effectually to dispose of the claimed negligence on the part of appellee storage company that it knew or should have known of the presence of water in its basement and the cave-in of the sewer prior to June 27. In addition, there is the uncontradicted testimony of the owner of appellee company that there was no backed-up water in his basement prior to June 27; that his employees were continually working there during that time; that before the basement floor could be flooded, any backed-up water would first have to fill the elevator pits which were the places that took all the drainage in the area; that these pits did not become filled with water prior to June 27; and that the owner of appellee company had no knowledge whatever of the cave-in of the sewer or any resulting backwater until after June 27. Moksnes testified that when he was in the basement between one and two days after the owner of the adjacent grocery company had discovered the flooding of his basement on the morning of June 19, he saw some water in appellee's elevator pits. It was normal to have some water in the pits. But before the basement could be flooded, these pits would first have to be filled with water, and they were not so filled at the time that Moksnes saw them, although water was then four inches deep in the adjacent basement. Moksnes' testimony—which was discredited and diametrically contradicted by written documents signed by him, in many crucial instances—that he saw a "trace" of water on the floor of appellee's basement, even if accepted, would not present for the determination of the jury the question of negligence on the part of appellee in failing to remove the hemp before June 27 on the ground that it knew or should have known of the cave-in of the sewer on June 18. A "trace" of water on the floor could come from many sources other than a flooding of the basement and seeing such a trace on the floor could not be considered notice to an owner that his basement was being flooded because of a break in a sewer in a street 300 feet away of which he had no knowledge. The district court properly directed a verdict of no cause of action in favor of appellee Rae Columbus, Inc.

We come, then to the government's case against the City of Columbus, based upon claimed negligence of the city in permitting sewer water to back up into the Rae Columbus warehouse on June 27 and June 28 by reason of failing properly to maintain and repair the sewer in question. It is contended that the city, after it had received notice of the flooding of the Kirk Grocery Company's premises on June 19, did not start excavating to ascertain the cause of this flooding until June 22; that it did not find the break in the sewer until June 26, the day before the extraordinary rainstorm of June 27; that, while the flooding of appellee company's premises causing the damage to the government hemp did not occur until the storm of June 27, the city could have found the break before June 26, if it had used due care and had not negligently delayed the excavating work; and it is implied that if the city had discovered the break before June 26, it could have repaired it and avoided the backwater and flooding of June 27. All of this is highly problematical and speculative.

The city officials in charge of the sewers did not know what caused the flooding of the grocery company premises prior to June 26. When the foreman of the city sewers was notified of the settling of the street, he went to the place and made an inspection of the sewer in question by removing a lid from a manhole which was almost directly over the sewer where, as it afterward appeared, the break had occurred. He looked down

into the sewer to see whether the flow of water was interrupted at that point, and found that it was not. This was the usual manner of making an inspection of a sewer of this size which did not permit of a man's walking in it. The sewer foreman thought that the flooding of the grocery company basement was due to a clogging in the sewer service to another private building. He then gave instructions to excavate down to the sewer and at the point where he judged the sewer service from the private building was located. The sewer itself was a deep sewer, nineteen and a half feet below the surface of the street. It required five days—until June 26—to get down to the break in the sewer, according to the general foreman. This was because of several factors: the location and depth of the sewer; the gravel soil; the fact that there was a water line on one side of the trench as they went down, and it was necessary to protect the water line with timbers held around it with cables. One of the important considerations also was the fact that the basement of the Case Company, adjacent to the sewer, required careful revetting of the excavation with heavy timbers as they went deeper to protect both against the cave-in of the excavation and the cave-in of the basement wall of the adjacent building. The work was started with pick and shovel and when the trench became too deep for such methods, a power hoist with a bucket was utilized to remove the dirt from the hole. In the judgment of the foreman and two engineers whom he consulted, this was the proper method to be used as a power shovel could not be safely availed of on account of the water pipe along the side of the trench and also because of safety considerations for the workmen in the hole. When they finally reached the top of the sewer on June 26, the break became apparent. The sewer was then dragged with a half-moon shaped bucket attached to a cable which was wound around drums and operated by small engines between the manhole near the break and another manhole located farther down the street in order to draw the broken material and refuse out of the sewer. While they were engaged in dragging or bringing out the debris from the break of June 18, one of the workmen in the second manhole kept complaining about water splashing in his face, and said it sounded like rocks falling in the water. It turned out to be part of the sewer falling in another place, although they did not know this was the fact until just about the time they thought they were going to "wind up the job," when they found, on July 3, that another break in the sewer, six feet long, had occurred; and final repairs were not completed until August 3. Mr. Fenner, as general sewer foreman, testified that he did not think any other methods could have speeded the work between June 21 and June 27, taking into consideration the workmen's safety, the nearness of the shaft to the Case Building, the locality, the gravel, and the water line. While Mr. Kirk testified that he had notified some employee of the city of the flooding of his basement and the settling of the street on June 19, Mr. Fenner, the sewer foreman, testified that he did not receive notice of the settling of the street until June 21 and the excavation was not started until June 22. He stated that, of course, if they had started excavating before June 22, "the days gained would have been that much ahead." But there is no proof of negligence on the part of the city in failing to repair the break of June 18 prior to the flooding of June 27 so as to avoid the backing of water into the Rae Columbus basement. Even while the repairs of the June 18 break were taking place, the sewer was caving in in another place nearby. The evidence was uncontradicted that the methods used to repair the break were proper. Contrary to the claim of the government, there was no evidence that the city employed insufficient manpower and equipment in making the repairs. The fact that the city had fifteen men available for such work in addition to the four or five who were continuously working there is not of controlling importance. Because all avail-

able workmen in the employ of the city were not used at the same time in digging the hole down to the sewer is not proof of negligence, in view of the undisputed testimony that the methods followed by the city officials were the proper ones to pursue. Although the government's petition did not allege negligence on the part of the city because of failure to inspect, it is to be said that the city was not at fault in this regard. These sewers were inspected by lifting the manhole covers and ascertaining that there was uninterrupted flow. This was the only inspection possible; and this type of inspection was made by the city. Moreover, an inspection immediately prior to the flooding would not have disclosed any defects in the sewer. The city was not liable for the defective condition of the sewer until after notice of the defect; City of Portsmouth v. Mitchell Mfg. Co., 113 Ohio St. 250, 148 N.E. 846, 43 A.L.R. 961; City of Salem v. Harding, 121 Ohio St. 412, 169 N.E. 457; Village of Willoughby v. Malone, 122 Ohio St. 315, 171 N.E. 402; and it then had a reasonable time to repair it before it could be held liable for resultant injury. Moreover, the evidence fails to disclose that the collapse of the sewer was caused by slow deterioration, as suggested. Sewers of the same type construction have been in use for more than seventy years in Columbus and are still giving good service, as is the sewer in question since the repairs were made. No one knows what caused the collapse of the sewer and no evidence was introduced on the subject.

On the single question of damages alone, the government, regardless of the question of negligence, could not prevail in this case. Prior to the flooding of June 27, nine bales of hemp had been damaged before it had even been stored with Rae Columbus, Inc. At the time of the backing up of water in the basement on June 28, the hemp stored therein was somewhat damaged because the water came in contact with the bottom part of the bales. How much this damage was, no one knows, or, at least, no evidence was introduced as to how slight or great was the damage to the hemp as a result of this backwater. Thereafter, the hemp was removed from the basement and stored on an adjoining lot, pursuant to government orders. In accord with instructions from the government, a roof of two by fours and tarpaulins was made over the bales. But later the wind blew the roof off the hemp and it became thoroughly soaked by several rainstorms. The man who purchased this hemp at a fraction of its value, after these rainstorms, found it was practically worthless and was obliged to haul most of it to the dump. On this state of facts, there was no evidence to submit to the jury that would enable them to ascertain what damage was caused by the flooding of June 27. It is true, as the government says in its brief, that Mr. Taylor, the secretary of the War Hemp Industries, the employer of Mr. Moksnes, was asked what was the market value of the hemp damaged by the backing up of the sewer, after it was removed from the warehouse, and that he testified it was worth practically nothing, as they were able to sell it for salvage at only one cent a pound. But Mr. Taylor admitted, on cross-examination, that he had never seen the hemp before or after it was damaged. He did not know what the value of the hemp was after it had been damaged by the backwater in the basement, or what the value was after it had been damaged outside in the weather, nor does anyone else know; and the price of one cent per pound was paid for the hemp after it had been stored out in the open on government orders and damaged by the several rainstorms, as above related. There was no evidence sufficient to warrant submitting the question of damages to the jury.

The government claims error on the part of the trial court in refusing to admit two letters into evidence. The first was written by the War Hemp Industries to Mr. Stinchcomb, the owner of the storage company, after the contract for storage had been executed between

the government and the storage company. The contract provided:

> "Unless otherwise directed, the Warehouse Company agrees to place dunnage under the bales to avoid damage from dampness and to store the hemp in such manner that there will be a space of at least one foot between the outside walls of the building and the bales of hemp."

In the letter, the War Hemp Industries stated:

> "Heretofore Commodity Credit Corporation has considered dunnage that would elevate the material eight inches above the floor to be sufficient dunnage for storage in basements. In this connection, some of the warehouse companies storing this material are using railroad ties. Dunnage on the upper floors of your building may be reduced so as to require an elevation of the hemp approximately six inches above the floor."

■ Mr. Stinchcomb, the owner of the storage company, testified without contradiction that the government inspector told him what dunnage to use; that the government required only two by four dunnage in appellee's basement and that, in supplying such dunnage, the storage company carried out the government's instructions. The statement in the letter which was excluded from evidence by the trial court was hardly more than an observation that *heretofore* the government had considered eight inch dunnage sufficient. To permit the letter to be introduced into evidence would be to allow the terms of the written contract to be varied subsequent to its execution, by a letter written by one of the parties to the contract; and such letter was *inadmissible under the parol evidence rule.* Nor was it within the claimed exception to the parol evidence rule—that the rule does not apply when the parties to the contract did not intend to integrate therein all its terms. The use of the words, "unless otherwise directed," did not reserve to the government the right to issue various specifications of dunnage of different dimensions, but only provided that the company was required to place dunnage under the hemp unless it was directed to do otherwise. Moreover, the dunnage was not provided for the purpose of holding the hemp above a flooded basement, but to protect against basement dampness, and the use of the dunnage in question by the storage company could not be considered as negligence constituting the proximate cause of damage resulting from the back-up of sewer water eight inches in depth, as it was not the purpose of dunnage to protect against an inundation. But more persuasive that the storage company complied with all conditions of the contract was the evidence of express approval by the agency representing the government of the dunnage which was actually used.

■ The other document which the court excluded from evidence was a letter from the War Hemp Industries to the owner of the storage company. This letter was dated June 26, 1946, and contained shipping instructions providing for the shipment of "all undamaged fiber stored in the basement" of the warehouse. The government was attempting to show that there was damaged hemp in the basement of appellee at that time; that such hemp had been damaged by the break in the sewer of June 18; and that the storage company was thus placed upon notice of the possibility of further damage from such sewer backwater. However, the only damaged hemp in the basement at that time consisted of the bales of hemp which, as already related, had been damaged before June 18 and, apparently, before it was even stored in appellee's basement. The foregoing is made amply clear by an examination of the testimony of the government's own witnesses, Moksnes and Taylor, and is emphasized by the able cross-examination of those witnesses by appellees' counsel. Since the letter in question had no reference to any hemp damaged by the rains or cave-in of June 18, or of June 27—inasmuch as the letter was

written before the latter date—it was entirely irrelevant, and its introduction could only cause confusion. It was, therefore, properly excluded by the trial court.

An examination of the record is convincing that the government failed to establish negligence on the part of Rae Columbus, Inc., or on the part of the City of Columbus. There was no error in the exclusion of evidence; and Judge Underwood, throughout the trial, clearly discerned, in the maze of confusing testimony, the controlling facts of the case, and properly directed a verdict of no cause of action.

The judgment is affirmed.